**BURNSTEIN et al. v. UNITED STATES.**

No. 6441.

Circuit Court of Appeals, Ninth Circuit.

Jan. 18, 1932.

Otto Christensen, Fred H. Moore, and Donald Armstrong, all of Los Angeles, Cal., for appellants.

Samuel W. McNabb, U. S. Atty., and J. Geo. Ohannesian, Asst. U. S. Atty., both of Los Angeles, Cal.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

WILBUR, Circuit Judge.

The appellants were convicted of a violation of the National Prohibition Act by selling, for beverage purposes, nine drinks of a medicinal preparation containing more than one-half of one per cent. of alcohol. The evidence showed that the particular preparation involved was known as Amargo Bitters, containing about 47 per cent. alcohol by volume. The label on the bottles stated 47 per cent. and the government chemist testified that he found 46 and a fraction per cent. The chemist also testified that the bitters contained emodin, which is a derivative of rhubarb, cascara, and senna, and also contained cascara, senna, rhubarb, and that although he made no attempt to identify the aromatics contained therein he judged they consisted of ginger, cloves, and other aromatics. Emodin, he testified, was a cathartic. The bottle containing the bitters states:

"These exquisite Bitters prepared on application of Angostura Bark, distinguished by exceptionally pleasant flavour and taste, have been approved by the public in every country, where they have been sent, on account of their excellent quality and purity and do not need any particular recommendation.

"These famous Bitters are known all over the world for use in all cases, in which aromatic Bitters are wanted.

"Guaranteed to contain no harmful drugs, only the most wholesome vegetable ingredients.

"Manufactured since 1877 in Hamburg. None Genuine without signature and corkbrand. Reg. U. S. A. Pat. Off. Egon Braun Amargo Bitters. Net contents 8 Fl. Oz. Contains 47% alcohol by volume. Made in Germany."

The proceedings were instituted by the filing of an information by the district attorney for a misdemeanor under the provisions of Criminal Code, § 335, as amended December 16, 1930, c. 15, 46 Stat. 1029 (18 USCA § 541). The information alleges that the appellants: "* * * did knowingly, wilfully, and unlawfully sell for beverage purposes to S. W. Brooks, a medicinal preparation, towit, nine (9) drinks of bitters, containing alcohol in excess of one-half of one per cent by volume, at and for the agreed price of two and 25/100 dollars ($2.25); in violation of section 4, title II of the National Prohibition Act of October 28, 1919, as amended."

It should be observed at this juncture that the definition of "intoxicating liquor" contained in 27 USCA § 4, section 1, tit. 2, 41 Stat. 307, includes all liquor, "whether medicated, proprietary, patented, or not, and by whatever name called, containing one-half of 1 per centum or more of alcohol by volume which are fit for use for beverage purposes," while medicated preparations which are unfit for beverage purposes are expressly excepted from the above definition and also from the general provisions of the National Prohibition Act relating to intoxicating liquor. 27 USCA § 13, section 4, tit. 2, National Prohibition Act, 41 Stat. 309, provides: "The articles enumerated in this section shall not, after having been manufactured and prepared for the market, be subject to the provisions of this chapter if they correspond with the following descriptions and limitations, namely: * * * (d) Toilet, medicinal, and antiseptic preparations and solutions that are unfit for use for beverage purposes."

It is, however, by that section made unlawful to sell for beverage purposes those medicinal preparations which are "unfit for use for beverage purposes." It is provided in section 13 that: "Any person who shall knowingly sell any of the articles mentioned in paragraphs * * * d of this section for beverage purposes, * * * shall be subject to the penalties provided in section 46 of this chapter." The question of the punishment will be considered later in the opinion, although it should be stated at this juncture that the punishment for selling intoxicating liquor originally fixed by section 46 (27 USCA § 46, section 29, tit. 2, 41 Stat. 316) has been increased by the amendment of 1929 known as the Jones Act, 45 Stat. 1446, as amended January 15, 1931, c. 29, 46 Stat. 1036 (27 USCA § 91), increasing the penalty for the sale of intoxicating liquor to $10,000, or imprisonment not to exceed five years, or both, where the sale exceeds one gallon; the punishment for violation is a fine of not to exceed $500, or confinement in jail not to exceed six months, or both, where the sale is of less than a gallon.

Appellee states that appellants are in error when they state that the appellee in the trial court proceeded upon the theory that Amargo Bitters was an intoxicating liquor and that the only issue involved was whether or not defendants actually sold the govern-

ment agent Amargo Bitters, as testified to by said agent. The appellee states that the sole question involved in the case was: "Did the defendants knowingly sell for beverage purposes a medicinal preparation, to-wit: several drinks of bitters, unfit for beverage purposes, in violation of section 4, title II of the National Prohibition Act; that this is the true issue involved is borne out by the fact that the case was presented by an information instead of by an indictment as would have been necessary had the government proceeded under the theory that the sales complained of were of intoxicating liquor fit for beverage purposes."

Appellee states: "Had the government proceeded upon that theory it would have been necessary and material for the government to have proven: 1st, that the sales were made by the defendants; 2nd, that the same was intoxicating; 3rd, that the intoxicating liquor thus sold was fit for and sold for beverage purposes. Had this course been followed and the government proceeded on the theory that what was in fact sold was an intoxicating liquor, a great deal of the evidence, excluded from the consideration of the jury on behalf of the defendants would have been material as a defense."

It will be observed at the outset that the question of whether or not the Amargo Bitters were fit for beverage purposes was of vital importance in the case in determining the evidence, the procedure, the instructions, and the punishment. If the bitters were fit for beverage purposes, it is only necessary to establish the fact that a sale had been made. If the bitters were not fit for beverage purposes, it is essential not only to show a sale but also to show that a sale was made for beverage purposes. The information did not allege that the bitters alleged to have been sold were intoxicating liquor, nor did it allege that the bitters were fit for beverage purposes.

It appears from the evidence that appellant Burnstein is the owner and proprietor of a large restaurant at 1555 North Vine street, in Hollywood, Cal. The restaurant is equipped in the usual fashion with rows of tables, booths, counters, cash registers, etc. It appears that three witnesses, A. M. Sheets, a government agent, his wife, Lillian Sheets, and an agent named S. W. Brooks, went to the restaurant and were escorted to a booth by appellant McNeil. Agent Sheets testified as follows: "We were escorted to a booth by Mr. McNeil and he brought us menu cards. I told him we wanted to get three shots of bit-

ters. He said 'all right' and left the booth. He returned in two or three minutes and brought us three small glasses of bitters. They looked like whisky glasses, and three small glasses of near-beer as chasers. We drank those and he returned and asked if we wanted some more; I told him yes, we would take another one, so he took the glasses up and returned with three more. Those were consumed, and he asked if we would have some more, and I said, 'No; I think we will have something to eat, first,' so we ordered sandwiches again and I told him to bring three more shots of bitters. He left in the direction of the bar and returned with three glasses of bitters."

Witness S. W. Brooks testified that he saw three men standing at the bar drinking "red liquid out of the same kind of glasses we were being served out of." He stated: "These men drank their drinks and went out. Then a little later on we told Mr. Burnstein who we were and went back of the bar looking for more of this bitters, and while Agent Sheets and I were behind the bar two more men came in and walked up to one of the bartenders and ordered bitters. The bartender looked at them and looked over at Agent Sheets and myself and winked at the fellows and they immediately turned and walked out. Mr. Burnstein was all around at that time; behind the bar and out in front, walking around from one place to another. Mr. Burnstein was there at the time we were making our search behind the bar."

Defendant Burnstein testified that his place of business had a seating capacity of about 210 people; they sometimes served as many as 300. "During September of 1930, we sold sometimes as much as two bottles of bitters a day, sometimes five drinks a day. We buy a case at a time. We don't keep track because we sell a very small amount. Not everybody drinks that, except some one comes and calls for a drink of bitters, and they get it. There are twelve bottles in a case and fifteen or sixteen drinks in a bottle."

He further testified: "I knew when the Eighteenth Constitutional Amendment went into effect and the purpose of the Eighteenth Amendment, and after the passage of the act I could sell it when a person comes in and asks for a dose of bitters for medicinal purposes. I knew it was wrong to sell it for other than medicinal purposes but nobody would drink it."

When he was asked, "How would you determine the fact whether a person was sick

or well before you sold him bitters?" he answered: "Of course I am not a doctor, but when a man comes in and says, 'Give me a dose of bitters,' I give it to him, I don't need to examine him. If he asks for it, I give it to him. * * * A sick man is not very particular."

██ At the time the appellants were arrested, five bottles of bitters which had been opened and partly used were found on the premises and in addition thereto from five to fifty empty bottles; the government witnesses testifying fifty, and the appellants to the lesser number. It is clear from the testimony, including that of the appellants themselves, that the bitters were sold to be drunk on the premises. That is, for beverage purposes, for a thing sold to be drunk is necessarily sold as a beverage. A beverage means something to be drunk. If the preparation sold, however, is intended by both the seller and the buyer to be used as a medicine, the sale would not be a violation of the National Prohibition Law, however much it might be in conflict with local laws prohibiting the practice of medicine or of pharmacy.

The appellants do not claim that they made any effort to determine whether or not the persons who purchased bitters from them were sick or in need of medicine. They did not ascertain from what ailment they were suffering and there is no evidence that they knew the medicinal value thereof, if any. There was no effort to determine the proper amount of bitters to be administered for the particular ailment with which the purchasers were afflicted. The label upon the bitters does not indicate the proper dosage nor the diseases which it is intended to cure. The label indicates that they are "for use in all cases in which aromatic bitters are wanted." "Bitters" are defined by the Century Dictionary as follows: "Specifically, a liquor (generally a spirituous liquor) in which bitter herbs or roots are steeped. Bitters are employed as stomachics, anthelminthics, and in various other ways."

The Encyclopaedia Britannica describes "bitters" as follows: "Bitters, aromatized and often alcoholic beverages containing a bitter substance or substances, used as tonics, appetizers or digestives. The bitterness is imparted by such substances as bitter orange rind, gentian, rhubarb, quassia, cascarilla, angostura, quinine and cinchona. Juniper, cinnamon, carraway, camomile, cloves and other flavoring agents are also employed in conjunction with the bitter principles, alcohol and sugar. Some bitters are prepared by simple maceration and subsequent filtration, others by the more complicated distillation process. Those prepared by the latter process are the finer commercial articles. Bitters are usually sold under the name of the substance which has been used to give them the predominant flavor, such as orange, angostura, or peach bitters, etc. The alcoholic strength of bitters varies, but is generally in the neighborhood of 40% of alcohol. Some bitters, although possessing tonic properties, may be regarded as beverages pure and simple, notwithstanding the fact that they are seldom consumed in an undiluted state; others again, are obviously medicinal preparations."

The New International Encyclopaedia defines "bitters" as follows: "Bitters. A term applied in popular speech to beverages containing alcohol and either aloes for a cathartic effect, etc."

The Americana defines "bitters" as follows: "Bitters, a popular name for a class of compounds largely employed as appetizers and digestants. They are for the most part alcoholic drinks to which some plant containing a bitter principle is added. The bitter principles are either alkaloids, as in the quinine of calisaya, or amaroids, which are widely distributed in plants. The most commonly employed bitters are quassia, gentian, angostura, cascarilla, wild cherry and cinchona. Medicinally bitters are classed as simple and aromatic, the latter containing volatile oils in addition to the bitter principles. The simple bitters mostly used are quassia, gentian and calumba. The aromatic bitters are cascarilla, eupatorium (boneset), angostura, serpentaria and chamomile."

██ The question of the sale of bitters under a statute of the state of Mississippi prohibiting the sale of intoxicating liquor was considered by the Supreme Court of that state in King v. State, 58 Miss. 737, 38 Am. Rep. 344. The article sold was "Home Bitters," a decoction composed of 30 per cent. of alcohol, and the rest of water, barks, seeds, herbs, and other like ingredients. It was alleged by the defendant to have been sold as a medicine. The court said: "One authorized to sell medicines ought not to be held guilty of violating the laws relative to retailing, because the purchaser of a medicine containing alcohol misuses it and becomes intoxicated; but, on the other hand, these laws cannot be evaded by selling as a beverage intoxicating liquors containing drugs, barks, or seeds which have medicinal qualities. The uses to which the compound is ordinarily put, the purposes for

which it is usually bought, and its effect upon the system, are material facts from which may be inferred the intention of the seller. If the other ingredients are medicinal and the alcohol is used either as a necessary preservative or vehicle for them—if from all the facts and circumstances it appears that the sale is of the other ingredients as a medicine, and not of the liquor as a beverage—the seller is protected; but if the drugs or roots are mere pretences of medicines, shadows and devices under which an illegal traffic is to be conducted, they will be but shadows when interposed for protection against criminal prosecution."

While this decision was not one involving the interpretation of the provisions of the National Prohibition Act, it is obvious from an inspection of the provisions of the latter act that the principles involved in that decision are applicable in determining whether or not a sale under section 13 (27 USCA) is or is not a sale for beverage purposes.

■ It seemed clear that when neither the seller nor the purchaser pretends to know what the medicine is good for or what the purchaser's physical condition is, and both know that the preparation contains 47 per cent. alcohol, it is impossible to avoid the conclusion that the purchaser intends to use the bitters as a beverage and not as a medicine and that the seller knows that such is his purpose. The time, place, and circumstances of the sale make it plain that the bitters were not intended as a medicine.

There are fourteen assignments of error and the brief contains five specifications of error. None of these specifications comply with the rule of this court which requires: "That a specification of error relied upon in an action of law shall set out separately and particularly each error asserted and intended to be urged; * * * When the error alleged is to the admission or to the rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected. When the error alleged is to the charge of the court, the specifications shall set out the part referred to totidem verbis, whether it be in instructions given or instructions refused."

■ The specifications of error contained in the brief are as follows:

Specification I: "There was error in the court's exclusion of the issue of intent as an element of the offense upon the trial, viz: The rejection of testimony and evidence offered upon this issue, and the court's statements that it was no issue in the case; there

was also error in the court's instructions in first excluding the issue of intent and then improperly submitting it to the jury, and in failing to give the instructions on this issue requested by the defendants."

This covers more than one point. Under this specification are grouped five assignments of error, i. e., 7, 8, 9, 11, and 14.

■ Specification No. II is as follows: "There was error in the court's instructions in that the court went beyond the legitimate scope of comment on the facts; directed the jury's attention to those specific facts that would support the government's theory of guilt, failing to point out the specific facts that would sustain the defendants' theory of innocence, and in substance and effect advised the jury to convict if they believed Amargo Bitters were sold as testified to by government witnesses; that the instructions as a whole constituted an argument on behalf of the government and as a whole were contradictory and confusing."

This specification does not. set forth the instructions complained of as required by the rule.

■ Specification No. III is as follows: "The remarks and conduct of the court during the progress of the trial which were so prejudicial as to deprive the defendants of their rights to a fair and impartial trial."  .

Under this specification appellant refers to, and partially quotes, assignment No. 3. This assignment is that of prejudicial misconduct in the trial of the case and contains six specifications, not one of which shows that an exception was taken at the trial.

■ The fourth specification: "The evidence is insufficient as to the defendant Burnstein."

Specification V is as follows: "The sentences. There was error in the judgment and sentence imposed by the district court in sentencing the defendants to a term of imprisonment in the county jail, for the reason that it was in excess of the powers of the court under the applicable paragraph in section 46 (27 USCA) which was not repealed by the passage of the Jones-Miller Act, March 2, 1929 (27 USCA § 91)."

The only specifications of error which comply with the rule of this court are specifications IV and V. With reference to specification IV it is sufficient to say there was ample evidence from which the jury might find that the sale of liquor in question was made for beverage purposes with the knowledge and consent and at the instance of and

as agent for appellant Burnstein. The motion for directed verdict in his favor was properly denied.

Notwithstanding the fact that specifications I, II, and III do not conform to the rule of the court, and in view of the fact that under specification I certain assignments of error are grouped, we will treat these assignments printed in the brief as specifications and will briefly consider them.

Assignment No. VIII is to the effect that the District Court erred in making a statement in the presence of the jury with reference to the question of intent. This statement was in response to an objection by the District Court to a question propounded by appellants' attorney to appellant Burnstein. It was not objected to at the time it was made, nor was any exception taken to the statement. The statement was apt to the question which was whether or not it was proper to show by the defendant that he had read an opinion by a United States District Judge dealing with the subject of the sale of bitters. As this colloquy occupies several pages in the transcript, it would unduly extend this opinion to quote the same in full.

Assignment No. XVI sets out in detail the evidence, but contains several subdivisions. A witness, F. Earl Brown, was called on behalf of the appellants. He was questioned as follows: "Were you familiar with the dispensing of bitters prior to prohibition?" This was objected to and objection sustained and exception was entered to the sustaining of the objection. The evidence was immaterial and probably was intended to be only preliminary.

The next question: " * * * Are you familiar with the chemical properties of Amargo Bitters?" The court sustained the objection on the ground that it was immaterial. The question was preliminary and was immaterial.

The next question: "Doctor, you are familiar with the reaction of Amargo Bitters when taken in quantities—its reaction on the system when taken in quantities of one ounce?" The district attorney objected to this on the ground that there is no showing that the doctor examined the parties named in this indictment. The court sustained the objection on that ground and on the court's theory that it was utterly immaterial. An exception was taken.

The next question: "Do you know whether or not, Doctor, Amargo Bitters or any other bitters can be used for beverage purposes?" This was objected to, the court sustained the objection, exception taken, and the court stated: "The question before the jury is whether it was used for beverage purposes. The objection is sustained." This ruling was also correct.

The question of the effect of Amargo Bitters on the system was a proper one for consideration upon the question as to whether or not the bitters were sold for beverage purposes. The question was purely preliminary. It is clear that if the purchaser had sought relief from some particular ailment and the bitters had been supplied by the appellants as a remedy for that ailment, that the good faith of the appellants in supplying this particular remedy for the particular disease would be germane; but where it is not shown that the purchaser was suffering from any ailment or pretended to be, or that the appellants knew anything about the medical properties of the bitters, the question of the medicinal effect of the bitters is not relevant. Under the circumstances of the case the trial court was correct in its ruling.

Assignment of error No. IX, the appellant Burnstein testified: "I have tasted bitters and don't think I would drink bitters for a beverage." The witness was then asked why, and answered, before objection, "Because it is not fit for beverage." Thereafter a colloquy occurred between the court and counsel after which the question was reread, objected to, no grounds stated, objection sustained, and exception taken. The reasons why the appellant did not think he would drink bitters for beverage purposes are quite immaterial. The answer of the witness disclosing the purpose of counsel shows that the appellant was attempting to prove that the bitters were not fit for beverage purposes. That matter we will hereinafter discuss further. The ruling of the court is sufficiently indicated by his remark during the colloquy: "It doesn't make any difference. The question is whether it was sold for beverage purposes to these three people."

The next ruling complained of is the refusal of the court to permit the introduction of an opinion said to have been rendered by the United States District Court, which dealt with the subject of Amargo Bitters. The evidence was properly rejected. Defendants are presumed to know the law, and an erroneous opinion of the court would not change the law.

Assignment of error No. XIV is based upon the rejection of one of appellants'

proposed instructions. It is sufficient to say we think the proposed instruction, in so far as it is correct, was sufficiently covered by the instructions given. The instruction was properly refused because that part of it hereinafter quoted was erroneous, to wit: "'Knowingly, wilfully and unlawfully' as used in the information, under which the defendants are charged, not only import knowledge of the act or thing done, but also import an evil intent or bad purpose in doing such a thing."

■ The following portion of the proposed instruction was also erroneous: "You are instructed that neither the law, nor the regulations, nor rules of the Prohibition Commissioner, define what a beverage use is, or what a medicinal use is, as applies to Amargo Bitters; nor does the law, nor the regulations, nor rules of the Prohibition Commissioner prescribe who may or who may not sell nor in what manner Amargo Bitters may be sold, except that they must not be sold, knowingly, for beverage purposes."

The instruction was misleading. There are many laws other than the National Prohibition Law, state and national, dealing with the subject of the dispensing of medicine.

■ With reference to specification II we are asked to reverse the case on the ground that the instructions, although not excepted to, were so prejudicial as to require this court to consider it as a plain error depriving appellants of a fair and impartial trial. We find no basis for this complaint. There is no serious dispute in the case as to the fact that the bitters in question were sold upon appellants' premises, by his agent, for the purpose and with the intent that the bitters should be drunk upon the premises. The court, throughout the trial, was directing the attention of counsel to the fact that if a preparation containing 46 per cent. of alcohol was sold by the appellants for beverage purposes, knowing the preparation was to be so used, that the defendants were guilty of the crime charged, regardless of whether or not the bitters were a preparation which had some medical value and which could be used for medicinal purposes. The court made it clear in its instructions and upon the occasions when considering objections to evidence that the real issue in the case was whether or not bitters having a large percentage of alcohol were sold as a beverage. The fact is that there is no evidence whatever which would justify the conclusion that the bitters were sold for any purpose other than as a beverage. We have already pointed out the evidence in that regard. The court stated: "I will say that whatever a man may believe he may do, he cannot sell any alcoholic liquor for beverage purposes without violating the law, no matter whether it is hair tonic, shoe polish or whatever it may be. It can't be done."

This observation was made in connection with an offer of proof and seems to state with accuracy the law upon the subject.

■ Returning now to the instructions, the record is in a somewhat peculiar situation, in view of the fact that before the noon recess the judge fully instructed the jury, evidently before his attention was called to the instructions proposed by the appellants, which had been left with the clerk but had not been handed to the judge. After the noon recess the court withdrew all instructions given before that time and instructed the jury to wholly disregard those instructions, and gave new instructions. This change was brought about in part by the exceptions reserved by counsel to the instructions already given. Counsel comment somewhat at length upon the first set of instructions, and in their briefs do not always carefully distinguish between the instructions which were thus given and withdrawn and those subsequently given.

A colloquy occurred between court and counsel at the conclusion of the first set of instructions with reference to whether or not the bitters were an intoxicating liquor. This colloquy is set out in the briefs and assigned as error on the theory that the colloquy was prejudicial to the appellants. It is as follows:

"The defendants, and each of them, further take exception to the court's charge where the court on two occasions said 'This is an intoxicating liquor.'

"The Court: You think it is not?

"Mr. Armstrong: I tried to show by a doctor that it was not.

"The Court: Oh, no you didn't; and if you put a dozen doctors on the stand to show that a liquid containing 46 per cent of alcohol by volume was not intoxicating, the court would instruct the jury to disregard it.

"Mr. Armstrong: An exception.

"The Court: This liquid is intoxicating, according to law. You may have a dozen exceptions. The court would be interested to know why you claim this is not an intoxicating liquor.

"Mr. Armstrong: Before a person could take enough of this particular liquor to become intoxicated, he would become so nauseated—

"The Court: What is intoxicating under the Volstead Act, by law?

"Mr. Armstrong: By law it is any liquor containing alcohol in excess of one-half of one per cent by volume, and which is fit for beverage purposes.

"The Court: That is your point?

"Mr. Armstrong: Yes. This is said by law to be unfit for beverage purposes. That is my exception."

The attention of the court having thus been drawn to the fact that although bitters might be in fact intoxicating, that if they were not fit for beverage purposes they are excluded from the definition of intoxicating liquor contained in the National Prohibition Act and the sale thereof was regulated by 27 USCA § 13, it is this situation which in part no doubt caused the court to withdraw its instructions and give the jury an entirely new set of instructions. In these later instructions the court pointed out over and over that the question in the case was whether or not the liquor sold was knowingly sold to be used for beverage purposes. The jury were given the statutory definition of "intoxicating liquor," and their attention called to the fact that this definition included only beverages which were fit for use for beverage purposes. The court instructed the jury that section 4 of title 2 of the act (27 USCA § 13) provides for the sale of articles containing alcohol which were not fit for beverage purposes, that the article in question was one of these, and instructed the jury as follows: " * * * If any person shall knowingly sell any of such articles for beverage purposes, he shall be subject to the penalties provided, so the question is here concretely clear cut whether these sales, as the court has said, or any one of them, were had under circumstances which convince you beyond a reasonable doubt the sellers or seller had knowledge that they were to be used for beverage purposes."

Again the court instructed the jury: " * * * you are instructed that it is incumbent upon the government to prove to your satisfaction, beyond a reasonable doubt, that the defendants, one or both of them, knowingly sold Amargo Bitters to the witnesses for beverage purposes. * * * It is necessary for you to find, of course—it is a logical necessity—that the defendants, whichever one of them you see fit to find guilty, intended the sales of bitters to be for use for beverage purposes, before you can return a verdict of guilty."

Appellants state their position in their brief as follows: "There is in this case no issue that Amargo Bitters contain 46 per cent. alcohol and that this percentage is an excess of the statute. The contention is that Amargo Bitters come within the exceptions provided for by section 4 of the National Prohibition Act, that it is a medicinal product *unfit for beverage purposes* by virtue of its medicinal contents. *We do not contend that it can be sold for beverage purposes; we deny that it was sold for beverage purposes.* We contend that it can be sold by the glass. The government admits that it can be sold by the bottle. The sole issue before the court on the trial of this cause was whether or not the sale made by the defendant McNeil to the government agent *was made knowingly for beverage purposes.*" (Italics ours.)

The appellee agrees that the crucial question in the case was as to whether or not the preparation was sold for beverage purposes. The jury were fully instructed upon that question. We find nothing in the conduct or instructions of the court which would prevent a fair consideration by the jury of the issue involved. We think it is unnecessary to consider in further detail the many points advanced by the appellants to enforce their contention that the remarks of the court are prejudicial to them, particularly in view of the fact that no exceptions thereto were taken at the trial.

We now come to a question in the case which goes to the validity of the sentence imposed. Appellants' contention may be stated thus:

Section 4 of title 2 of the National Prohibition Act, now incorporated in the United States Code as 27 USCA § 13, provides that the punishment for the sale of nonbeverage alcoholic liquors for beverage purposes is that provided by section 29, now incorporated in the code as 27 USCA § 46, that this section has two different penal provisions contained in two separate paragraphs, the first paragraph applying to the manufacture and sale of intoxicating liquor, and the second paragraph providing a punishment for all the acts prohibited by the National Prohibition Act, not otherwise provided for. It is contended by appellants that the punishment provided by the second paragraph is the one properly applicable to the offense with which appellants are charged. Consequently, it is contended that the Jones Act (27 USCA § 91, 45 Stat. 1446, 46 Stat. 1036) applies only to the first paragraph of section 13 and not to the second paragraph. The Jones Act provides that: "Wherever a penalty or penalties are prescribed in a criminal prosecution by this

title, for the illegal manufacture, sale, transportation, importation, or exportation of intoxicating liquor, as defined by section 4 of this title, the penalty imposed for each such offense shall be a fine not to exceed $10,000 or imprisonment not to exceed five years, or both."

Then follows a proviso with reference to sale of less than a gallon, which is punishable "by fine not to exceed $500, or confinement in jail not to exceed six months, or both." Appellants were subjected to both fine and imprisonment, the appellant Burnstein having been sentenced to pay a fine of $500 and to be confined for six months in jail, and the appellant McNeil sentenced to pay a fine of $200 and to be imprisoned in the county jail for 30 days, but he was granted probation as to the 30-day term of imprisonment. The appellee's only answer to the appellants' contention with reference to the proper construction of the statutes with reference to the punishment for the offense charged is as follows: "* * * We respectfully submit that section 13 of title 27, USCA provides that the penalty to be imposed for violation of such section shall be the penalty provided in section 46 of this chapter and said section provides the correct penalty to be imposed for the violation with which the defendants are charged."

Now it will be observed that section 46 provides that "any person who manufactures or sells liquor in violation of this chapter shall for a first offense be fined not more than $1,000, or imprisoned not exceeding six months, and for a second or subsequent offense shall be fined not less than $200 nor more than $2,000 and be imprisoned not less than one month nor more than five years."

This section, it will be observed, does not permit both fine and imprisonment for the first offense of selling "liquor." Section 1 of title 2 of the act (27 USCA § 4) defines the word "liquor" as equivalent to the phrase "intoxicating liquor," and therefore confines the meaning of the word "liquor" to alcoholic beverages "which are fit for use for beverage purposes." The second paragraph of section 46 provides that any person who violates "any of the provisions of this chapter, for which offense a special penalty is not prescribed, shall be fined for a first offense not more than $500." Appellee, therefore, leaves us in doubt as to the position of the government, for whether the offense be punished under the first or second paragraph of section 46 the offender cannot be punished

by both fine and imprisonment, as was done in the case at bar.

The proper interpretation of section 46 in connection with section 13 (27 USCA) is a matter of some difficulty. The question turns upon the phrase contained in the second paragraph of section 46 which limits the penalty therein proposed to offenses for which a "special penalty is not prescribed." Section 13 expressly provides that the offender "shall be subject to the penalties provided in section 46 of this chapter." It cannot be said, therefore, that no penalty is provided for the violation of section 13 because such penalty is prescribed by reference to section 46. Consequently, it is clear, we think, that the penalties prescribed in the first paragraph of section 46 are those intended by Congress to be applicable. This view is fortified by the fact that where a person sells alcoholic liquor for beverage purposes it is immaterial whether or not such preparations are fit to be used as beverages. What he actually does is to sell an intoxicating liquor, although for convenience in the terminology of the National Prohibition Act it is not included in the definition of intoxicating liquors. It would be reasonable to suppose that the same penalties were to be imposed for the sale of alcoholic liquor for beverage purposes whether it was fit for such purposes or not. We therefore conclude that the penalty fixed by statute for the first offense for the sale of medicinal preparations unfit for beverage purposes containing more than one-half of one per cent. of alcohol, to be used for beverage purposes, is contained in the first paragraph of section 46. This paragraph does not support the sentence imposed by the court, and in order to do so we must turn to the Jones Act.

Counsel for the appellants assumes that if the first paragraph of section 46 applies, then the Jones Act which modifies the penalties there contained, would also be applicable, and that it would follow that the sentence imposed herein is legal. Having met the argument of appellants, we might perhaps be justified in accepting their view that the penalties of the Jones Act apply. In view of the fact, however, that the question of the validity of the sentence has been expressly raised by the appellants, we think the effect of the Jones Act must be further considered. This legislation increases penalties prescribed by the National Prohibition Act "for the illegal manufacture, sale, transportation, importation, or exportation of intoxicating liquor, as defined by section 4 of this title." 27

USCA § 91. By the express terms of this act it is confined to the modifications of punishment for the sale, etc., of intoxicating liquor as defined by section 1 of title 2 of that act. Now, section 1 of title 2 of that act (27 USCA § 4) expressly excludes from the definition of intoxicating liquors medicinal preparations which are unfit for beverage purposes.

The Jones Act, therefore, by its express terms, is inapplicable to the sale of preparations covered by section 13 (27 USCA § 13, National Prohibition Act, tit. 2, § 4). If the legislation of 1929 and 1931, known as the Jones Act, had taken the form of an amendment of section 46 of 27 USCA (National Prohibition Act, tit. 2, § 29), the reference in 27 USCA § 13 (National Prohibition Act, tit. 2, § 4) would under our view, as to applicability of the first paragraph thereof to nonbeverage medicine, effect a change in the penalty for the sale of preparations covered by 27 USCA § 13.

We conclude then that the penalty provided in the first paragraph of 27 USCA § 46 applies to the offense of which appellants have been found guilty by the jury. The sentences exceed these penalties, in that in both instances a jail sentence and a fine is imposed. We find no other error in the record. The judgment will be reversed, and the case remanded with instructions to the trial court to impose a sentence under the provisions of the first paragraph of 27 USCA § 46; that is, a fine of not more than $1,000 or imprisonment not exceeding six months.